## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | |
| | § | **CRIMINAL NO. H-04-512-SS** |
| **JAMES PATRICK PHILLIPS,** | § | |
| **WESLEY C. WALTON, and** | § | |
| **JAMES BROOKS** | § | |

## UNITED STATES' FILING IN SUPPORT
## OF OBSTRUCTION ENHANCEMENT

I.

In addition to the independent bases for assessing an obstruction

enhancement against defendant **BROOKS**, defendants **BROOKS**, **WALTON**,

and **PHILLIPS** earn two points for obstructing or impeding the administration of

justice pursuant to §3C1.1 of the Federal Sentencing Guidelines for lying during

interviews with attorneys hired by El Paso to determine facts to respond to various

federal investigations into false reporting to industry trade publications.

II.

Defendants qualify for the two-point enhancement whether the Court

applies the 2001 Guidelines Manual or the Guidelines in effect now when

defendants are sentenced. If the Court applies the 2001 Guidelines, the Court may

also consider Amendment 693 of the of the Supplement to Appendix C dated

November 1, 2007, to the extent that Amendment 693 clarifies the 2001 version.

*See United States v. Gonzalez*, 281 F.3d 38, 46 (2d Cir. 2002) ("When an amended

version of a guideline represents only a clarification by the Sentencing

Commission of the original version rather than a substantive change, the amended

version is to be applied.")

Amendment 693 provided the following clarification to Section 3C1.1:

Section 3C1.1 is amended by striking "during the course of" and inserting "with respect to".

Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."

The Amendment expressly states:

Reason for Amendment: This amendment addresses a circuit conflict regarding the issue of whether pre-investigative conduct can form the basis of an adjustment under §3C1.1 (Obstructing or Impeding the Administration of Justice)..." and cites examples, including *United States v. Fiore*, 381 F.3d 89, 94 (2nd Cir. 2004) where a defendant's perjury during an SEC civil investigation constituted obstruction of justice of the criminal investigation of the same "precise conduct" for which defendant was criminally convicted, even though the perjury occurred before the criminal investigation commenced.

III.

As a preliminary matter it is not clear that the obstructive conduct occurred prior to the start of the investigation. As reflected by the attached time line, the United States Attorney's Office had issued a criminal grand jury subpoena months before the defendants' interviews with El Paso's attorneys. Although the grand jury subpoena focused on wash trades, the grand jury subpoena encompassed reporting of those wash trades to industry trade publications. Further, in addition to the criminal grand jury subpoena, for months before their interviews defendants had themselves been aware of and providing information about wash trading and false reporting for investigations by the Securities Exchange Commission (SEC), Commodities Futures Trading Commission (CFTC), and Federal Energy Regulatory Commission. El Paso hired outside civil attorneys to determine facts it needed to respond to the multiple investigations: the interviews happened because of the investigations. The same day of defendant **PHILLIPS's** interview, El Paso filed a response with the FERC acknowledging possible wrongdoing related to false reporting. The day before defendant **BROOKS** and **WALTON's** interviews, El Paso lawyers alerted the United States Attorney's Office to possible criminal activity with respect to price reporting of trade publications and produced copies of El Paso's Response and Supplemental Response to the FERC's data request to the USAO.

IV.

However, even if the interviews occurred prior to the start of the investigation, defendants' conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction. Although the interviews were conducted by civil attorneys, defendants knew the interviews related to various federal investigations of El Paso for false reporting of natural gas prices and defendants were expressly warned during the interviews that "...the Company may wish to disclose that information to other third parties, including government agencies. [Gov. Exhibits 1364; 1368; and 1369] The interviews, replete with falsehoods, misdirections, and material omissions, were indeed subsequently produced to the government. Defendants' lies during the interviews were about the precise conduct for which defendants were later criminally indicted and convicted.

V.

Defendants' obstructive conduct helped to cause years of delay and increased costs in this investigation. It may have contributed to some wrongdoers going unpunished. As stated by one of the FBI investigators on the case: "...when anybody makes a false statement in an investigation, it changes the course of the investigation. It puts it into a different direction." [Attachment 2--Testimony of FBI SA Maria Borsuk during trial of Greg Singleton: Tr. p. 195, ll. 8 - 11] The

United States respectfully requests that the two-point obstruction enhancement be

applied to all defendants.

Respectfully submitted,

TIM JOHNSON
UNITED STATES ATTORNEY

/s/Belinda Beek
Belinda Beek
John Lewis
Assistant United States Attorneys

## TIME LINE

● On or about July 12, 2002, the United States Attorney's Office for the Southern District of Texas ( "USAO"), began investigating El Paso's natural gas trading practices, including whether El Paso engaged in reporting "wash trades"[1] to industry publications. [See Gov. Ex. 1342–July 12, 2002 El Paso press release announcing receipt of grand jury subpoena from USAO.]

● On August 12, 2002 El Paso's legal department sent an email to defendant **PHILLIPS** and others asking for assistance in gathering documents responsive to a grand jury subpoena from the USAO. The email asked if trades on the attached list (wash trades) had been reported to any industry publication. [Gov. Ex. 1343] This email was resent the next day, August 13, 2002 to defendant **PHILLIPS** and others. [Gov. Ex. 1344]

● Shortly after receiving the re-sent email on August 13, 2002, trader Greg Singleton sent defendant **BROOKS** an email that said: "FYI. What do you think. We do not keep record of what we posted to the publications." [Gov. Ex. 1345] Singleton's email to **BROOKS** was effectively a coded message because, as reflected in the trial testimony of Greg Singleton, Randall Richards, and Rick Johnson, both Singleton and **BROOKS** knew that **BROOKS** had previously

---

[1] A "wash trade" is a simultaneous, or nearly simultaneous, buy and sell of a commodity at the same price and volume between the same counter parties.

ordered all records of reports to trade publications deleted. [See, e.g., Testimony of Rick Johnson: Tr. p. 5450-5451]

● On or about October 16, 2002, El Paso had received a subpoena from the CFTC about the company's price reporting to industry publications. [Gov. Ex. 1349]

● On or about October 17, 2002 an internal El Paso email with the subject line "CFTC Subpoena–Jim Brooks" notified various individuals at El Paso of a meeting about the CFTC subpoena and directed Jim Brooks, head of El Paso's natural gas trading segment, to "invite your direct reports and others with knowledge of price reporting matters." The email also stated that outside counsel retained by El Paso would be attending the meeting. This email was forwarded to defendant **PHILLIPS** and others on October 21, 2002 with the statement "Must attend." [Gov. Ex. 1351]

● On or about October 21, 2002 a questionnaire was sent to El Paso traders including defendants **PHILLIPS** and **WALTON**. The Questionnaire, from El Paso's internal legal counsel, says: "As you know, El Paso has received a subpoena from the Commodity Futures Trading Commission ("CFTC") with regard to price reporting to energy industry trade publications. In preparation for responding to this subpoena, we need the following information from anyone who preformed any trading function for any commodity or have had any

communications with any energy industry trade publications since January 1, 2000." [Gov. Ex. 1352–page 2]

* On or about October 21, 2002, defendant **PHILILPS** responded to the Questionnaire. [Gov. Ex. 1353]

* On or about October 22, 2002, the FERC issued a data request to El Paso for information about price reporting to trade publications. [Gov. Ex. 1354]

* On or about October 25, 2002, defendant **WALTON** responded to the Questionnarie. [Gov. Ex. 1355]

* On October 31, 2002, defendant **BROOKS** convened a meeting with several traders, including Sharon O'Toole:

Q. Do you recall at the end of this month that we're discussing, the end of October, 2002, an occasion when you were asked to come in over the weekend to meet with Mr. Brooks?

A. It was after one of the meetings where Carol Messer had asked us to provide the backup information and Jim had said that Mr. Brooks had said that we were going to have to come in over the weekend to get -- to derive these numbers from our books. And in the meeting nobody really agreed to do so.

So, after we got out of the meeting -- and it may have even been later

that afternoon or the next day or -- at some point, he called us in by regions. And it was Chris Bakkenist, Ross Shipley and me from our region. And he called us into an office and said, "We have to back into these numbers. We have to come up with the numbers, and we need to do it this weekend."

And, you know, Chris and Ross and everybody kind of went, "No way. It's bad enough as it is. We're not going to make anything worse. We're not going to do it."

[Testimony of Sharon O'Toole: Tr. p. 4292, lines 6 - 25]

O'Toole made a contemporaneous note of the meeting. [Id. at p. 4293, lines 11-18; Gov. Ex. 1356]

● On or about November 8, 2002 El Paso filed its response to the FERC data request ("Response"). The Response stated that "Since receiving the data request, EPME has begun *interviewing* its current employees who are responsible for trading natural gas to determine whether they communicated with the Trade Press, and, if so, the nature of those communications." [Gov. Ex. 1361, p. 2] The Response also identified defendants **PHILLIPS** and **WALTON** as persons who "may have provided, either directly or indirectly, market information to the Trade Press during the period of time specified in the Data Request." [Id. at p. 3]

● On or about November 13, 2002, El Paso filed its supplemental response to the FERC data request ("Supplemental Response"). The Supplemental Response

notes that "The information submitted by EPME is part of the Commission's ongoing investigation into potential manipulations of electric and natural gas prices..." [Gov. Ex. 1362, p. 1] The Supplemental Response identified an email and telephone recordings El Paso had discovered in which an editor at *Inside FERC* questioned the accuracy of information submitted by an El Paso employee named Todd Geiger. ("Geiger") The Supplemental Response also noted that Geiger had refused to be interviewed and had resigned on November 12, 2002. [Id. at pp. 2-3]

● On or about November 13, 2002 El Paso issued a public press release ("Press Release") announcing that in response to the October 22, 2002 FERC data request, it had retained an outside law firm ("Outside Lawyers") "to analyze the accuracy of the information that El Paso Merchant Energy reported to trade publications." The press release also stated that El Paso anticipated having preliminary results of the investigation in approximately two weeks. [Gov. Ex. 1363]

● On or about Nov. 13, 2002, El Paso's Outside Lawyers interviewed defendant **PHILLIPS** about the the subject of the various government false reporting investigations. During the meeting, defendant **PHILLIPS** lied about the precise conduct for which he was later criminally indicted: **PHILLIPS** did not disclose, falsely denied, and otherwise concealed that he had provided false

trading information to trade publications[Gov. Ex. 1364]

● On or about November 19, 2002, El Paso lawyers alerted the USAO that El Paso had uncovered possible criminal activity related to price reporting to trade publications, and produced copies of El Paso's Response and Supplemental Response to the FERC's data request to the USAO. [Attachment 3-Testimony of SA Maria Borsuk from the trial of Greg Singleton: Tr. P. 184-185]

● On or about Nov. 20, 2002, El Paso's Outside Lawyers interviewed defendants **WALTON** and **BROOKS** about the subject of the various government false reporting investigations. During the meetings, defendants lied about the precise conduct for which they were later criminally indicted: defendants did not disclose, falsely denied, and otherwise concealed that they had provided, or caused to be provided, false trading information to trade publications [Gov. Ex. 1368 and 1369]

● On or about January 28, 2002, El Paso provided copies redacted copies of the interview memoranda of **PHILLIPS, WALTON,** and **BROOKS** to the USAO, CFTC, and the FERC. Unredacted copies were provided on or about February 13, 2002. [Attachment 4: Testimony of SA Maria Borsuk from the trial of Greg Singleton: Tr. P. 189-190; Gov. Ex. 649 and 649.1 from Trial of Greg Singleton]

# ATTACHMENT "2"

Borsuk - Direct by Ms. Beek

1          *THE COURT:* Sustained.

2     BY MS. BEEK:

3     *Q.* Without a reference point, was it feasible to listen to

4     hundreds of thousands of hours of calls?

5     *A.* No.

6     *Q.* If Mr. Singleton lied in his Haynes and Boone interview,

7     did that have an impact on the investigation and if so, how?

8     *A.* If Mr. Singleton lied in his interview -- when anybody

9     makes a false statement in an investigation, it changes the

10    course of the investigation. It puts it into a different

11    direction.

12    *Q.* When you left Houston or when you first stopped being

13    actively involved in this investigation -- I'm sorry, could you

14    give me that date again, when you stopped becoming actively

15    involved and, again, just approximately?

16    *A.* Approximately mid-June of 2004.

17    *Q.* And when did you leave -- actually leave Houston to move to

18    Washington?

19    *A.* The end of August 2004.

20    *Q.* When you left in the summer of 2004, had Mr. Singleton been

21    charged with any crime at that time?

22    *A.* No.

23         *MS. BEEK:* I'll pass the witness.

24         *THE COURT:* Okay. Let's go a little while longer.

25    Are you okay, ladies and gentlemen? We didn't get out here

# ATTACHMENT "3"

Borsuk - Direct by Ms. Beek

1  Q.  Is it an outside law firm? They're not part of El Paso,
2  are they?
3  A.  They're an outside law firm. They're not part of El Paso.
4  Q.  I'm going to limit my next questions -- first of all, we
5  see that an investigation is being announced here in the press
6  release and it says, "The investigation is not yet complete,
7  but they expect having preliminary results in approximately two
8  weeks." I'm going to limit my questions about these interviews
9  to their impact on the investigation of Greg Singleton. Do you
10 understand?
11 A.  Yes.
12 Q.  Okay. You mentioned earlier that the U.S. Attorney's
13 Office acquired the FERC daily request and the supplement on
14 November 13th, is that right, on or about November 13th?
15 A.  I think it was the 19th.
16 Q.  I'm sorry. November 19th --
17 A.  19th.
18 Q.  -- you're correct.
19                Do you know how the U.S. Attorney's Office
20 acquired the FERC -- sorry, the El Paso response and the
21 supplement to the FERC daily request?
22 A.  My understanding is that their attorney, Ron Woods,
23 provided a copy to the U.S. Attorney's Office.
24 Q.  And is the United States Attorney's Office sometimes
25 abbreviated USAO?

Borsuk - Direct by Ms. Beek

1    A.   Yes.

2    Q.   On or about November 19th when Mr. Woods provided the U.S.

3    Attorney's Office with copies of El Paso's FERC response and

4    supplement, could you tell the jury the context of how that

5    information was provided?  Why was Mr. Woods at the U.S.

6    Attorney's Office that day?

7    A.   I don't recall.  Mr. Woods would come over periodically to

8    provide information requests.  That day specifically, I don't

9    recall.

10   Q.   Okay.  We'll come back to that.  If I could direct your

11   attention to Exhibit 647 and I -- no, I'm sorry.  We'll just

12   move on.

13              If you could -- well, before I get into that, is

14   it your understanding that the Haynes and Boone law firm

15   interviewed Greg Singleton on November 22nd, 2002?

16   A.   Yes.

17   Q.   Have you reviewed --

18              MS. BEEK:  And don't display it on the screen, please,

19   yet.

20   BY MS. BEEK:

21   Q.   -- Government's Exhibit 649?

22   A.   Yes.

23   Q.   Do you recognize that document?

24   A.   I do.

25              MR. NUGENT:  May we approach, Your Honor?

# ATTACHMENT "4"

Borsuk - Direct by Ms. Beek

1  well, did those documents come out of the files of the U.S.
2  Attorney's Office?
3  A.  Yes.
4        MS. BEEK:  Your Honor, if I could just speak to
5  Mr. Nugent and Mr. Flood for one second?
6        THE COURT:  Sure.
7        (Ms. Beek conferring with Mr. Nugent and Mr. Flood.)
8        THE COURT:  You can review the memo, 649, if you want
9  while you're waiting --
10       THE WITNESS:  Okay.
11       THE COURT:  -- while they're conferring.
12             You can chat among yourselves if you want.
13       MS. BEEK:  Your Honor, at this time the United States
14  would offer 649, Government Exhibit 649.1.  And you can show
15  that.
16       THE COURT:  No objection?
17       MR. CHRIS FLOOD:  No objection, Your Honor.
18       MR. NUGENT:  No, Your Honor.
19       THE COURT:  Okay.  Received.
20  BY MS. BEEK:
21  Q.  What are we looking at in Government's Exhibit 649.1?
22  A.  There are two different letters.  The first one is dated
23  January 28th, 2003, from --
24  Q.  And is it -- I'm sorry.  It's from?
25  A.  From Ronald G. Woods.

Borsuk - Direct by Ms. Beek

1   Q.  And who's it -- is it to our own Mr. Lewis?

2   A.  Yes, it is.

3   Q.  Okay.  And you don't have to read the whole thing.  Is it

4   transmitting these Haynes and Boone interviews?

5   A.  Yes.

6   Q.  Okay.  And the second page, which is another letter --

7          MS. BEEK:  Could you display that one, please?

8   BY MS. BEEK:

9   Q.  -- what do we see in the second page of 649.1?

10  A.  It's another letter from Ronald Woods dated February 13th,

11  2003, to Mr. Lewis.  And this time it's a CD-ROM that shows the

12  dates of the Haynes and Boone interviews.

13  Q.  I'm sorry, what was the date of the first letter on the

14  first page?

15  A.  January 28th, 2003.

16  Q.  Do you know why they had to send the dates separate?

17  A.  I think first -- when they came in, they were redacted, so

18  there were no actual dates of interview.  I think, if I

19  remember correctly, they all had the same date, maybe the date

20  they were printed or something.

21  Q.  Was Mr. Singleton's Haynes and Boone interview transmitted

22  in this group that came to the U.S. Attorney's Office on or

23  around January 28th, 2002?

24  A.  Yes.

25          THE COURT:  Were the memos -- were you -- well, strike